Next case is number 09-1389, Treeposition v. Andrew Corporation. Mr. Krell. Thank you, Your Honor. May it please the Court, this appeal involves an infringement judgment for more than $48 million. That judgment should be reversed. Treeposition's misleading conduct in the course of getting its technology incorporated into an industry standard should have equitably stopped it from pursuing its infringement claims against Andrew. Independently, the judgment should be vacated because the District Court incorrectly precluded Andrew from presenting its anticipation defense. That error, we believe, requires a new trial. Now, apart from these issues, the case also presents two substantial statutory issues. Specifically, the District Court failed to apply the two relevant infringement statutes, 271A and 271F2, as written to the undisputed facts. Those errors had the effect of doubling the damages award. As to those issues, I don't have a lot to add to the analysis in the briefs, although I'd be happy to address any questions the Court might have. Otherwise, I'd like to focus on the standards-related issues and the anticipation issue. On infringement, are we talking just about willfulness, or are we talking about an on-sale bar? Not an on-sale bar, but an infringement by being on sale? Well, we're talking about a challenge to the willful infringement finding, and the basis for that challenge is that under the jury instructions, the jury had to find pre-suit infringing conduct. The only alleged pre-suit infringing conduct on which they could have based that finding was the supposed offer to sell to Saudi Telecom. Offer to sell what? This is a system that consists of at least three cell-site systems, each of which has an antenna, a converter, and a receiver, and then a central site system comprising other things. Was it an offer to sell all these things in the United States? Well, there was no offer to sell in the United States, and that's the fundamental point. The offer to sell was made in Saudi Arabia. And where was the sale? The sale was in Saudi Arabia, but again, on the willfulness finding, the sale was post-suit conduct, wherever it occurred. The pre-suit conduct, and under the jury instructions, there had to be pre-suit infringement. The alleged pre-suit conduct was the offer to sell. That clearly happened in Saudi Arabia. The facts are undisputed that the offer was communicated there. You've got to have communication for there to be an offer. But it was originated in the United States. Well, the offer was drafted in the United States, but ROTEC makes quite clear that it's where the offer is communicated because you don't have an offer until there is communication. To have an offer, it has to be something that can be accepted, and that can't happen until there's communication. So that's- We can consider the facts of ROTEC were really quite different. Well, they were different, but I don't think they were different in any relevant respect, Your Honor. There was substantial US-based activity. In fact, even a meeting between a supposed representative of the offeree and the offeror in the United States, we don't even have that here. The evidence is just undisputed that the offer was delivered by hand delivery in Saudi Arabia. Could not have been accepted prior to that, so there was no offer prior to that. Well, every case has a different set of facts, but let's take a look a little bit of how the offer needs to be communicated. What would happen if, in fact, the offer documents were prepared by email here in the United States sent to an agent? The particular agent is in Saudi Arabia, the offeror, and the agent is told not to deliver the offer until he is so instructed. Is that offer made in Saudi Arabia, or is that offer made in the US? Offer is made in Saudi Arabia. Why? Because it was not communicated to the offeree in the United States. Could not have been accepted prior to communication. That is the hallmark of an offer to sell. As this court made clear in a contract law principles apply, they require communication. That is the essential hallmark of an offer to sell. I could generate all of the documents that are necessary here in the United States and then hold them by email somewhere else, offshore, through an agent, and there's no offer until that is communicated to the offeree. Absolutely. That's correct. Is that our law? Is that Supreme Court law also? I believe that's your law, Your Honor. I don't know that the Supreme Court has spoken to the question other than the general contract law principles apply to offers to sell in the patent context. Well, I was trying to change the subject, so if you want to pursue this a little more, proceed. I wanted to ask, how is the Microsoft AT&T decision by the Supreme Court impact the issue of the offer? I'm not sure that it does, Your Honor, other than it makes clear that when you're talking about extraterritorial effect of the statutes, they're to be construed narrowly in accordance with their strict language. Microsoft versus AT&T obviously involved the transmission of software overseas, not offer documents, and so I'm not sure other than the general narrow interpretation principle that it's directly applicable. So even if the impact is within the United States, the impact is certainly not impacted by the patent laws. Patent laws are still limited to domestic limitations and not international limitations. That's correct, Your Honor. Judge Newman, you were about to change the subject. I think that we understand that aspects are resolved contrary to the position that you've taken, so I suggest we get to your strongest point, which I think was the first one you started with. That's what we think also, Your Honor. Turning to those standards issues, as to those issues, the district court's findings established the essential predicates for equitable estoppel. The district court found the true position knew that it needed to convince the standards body that multiple vendors could use the proposed standard if it were adopted. Throughout the three-year standards process, true position believed that its patent was essential to the proposed standard. True position told the standards body that it would license any essential patents that it might have. The standard body's rules required disclosure of any patents that might be essential to a proposed standard. True position did not declare the 144 patent, and its failure to declare it was misleading. But that failure wasn't in California, and you're talking about California competition law, isn't that right? Well, that's one issue, Your Honor. But isn't it correct that they could not have, under the rules, there was not supposed to be a discussion of intellectual property at the California meeting? No, that is not correct, Your Honor. There's a conflict in the evidence about that. And on that, I would direct the court to appendix page 4388, which is a portion of the procedures governing the standards body meetings. And it says that each meeting is to begin with a call for a reminder about the intellectual property rights. Also, there are to be reminders whenever a proposal is made at a meeting. And importantly, what that provision says, what that section of the rule says is, the chairman is to record in the report of the meeting any responses that were made. Now, it doesn't say that responses have to be made at the meetings, but it clearly contemplates that responses can be made. So we think that Judge Robinson just missed those facts. And again, this was summary judgment on the California claim, Your Honor. Moreover, we think that California law is really broader than that, requires an impact in California. It doesn't necessarily require that the misleading act occur in California. But even if it did, we think there was sufficient evidence to create a factual issue as to that. Now, on the more general equitable estoppel claim, based on true positions representations concerning its intellectual property rights, Andrew worked with true position for almost two years to get the standard adopted. Then when the standard was adopted and true position realized that Andrew might want to use the standard, it told Andrew for the first time that that use of the standard would infringe and that it would not license this patent. But you knew from the prior settlements that the 144 patent wasn't licensed. That's correct. It was not licensed in that settlement. And obviously, that's what the district court relied on. That's the only thing she relied on not finding equitable estoppel. And we think that's where she went astray. That agreement had nothing to do with the obligations arising out of the standards process. The question really was, though, what was understood? Could it have been understood that the control channel was necessarily available, even though that had been refused in the arrangement in the settlement? Let me answer your question by providing some of the background on the settlement agreement, Your Honor. That suit did not involve control channel technology. It involved only voice channel technology. The 144 patent was not asserted in that litigation. Importantly, the settlement agreement was executed while the standards process was still in the middle of the process. It wasn't even clear whether a standard would be adopted or what it would be adopted. The work continued for about another 11 months after the settlement. So whatever might have happened before, there were new obligations created as this process continued. Then why was Judge Robinson wrong in saying that Andrew should not have assumed automatically that it would be included or that it was included in the standard? Oh, Andrew did not assume that it had a license. What Andrew understood from true position's patent was that the standard could be practiced without need for that patent. Once the standard was adopted, true position changed its tune and said, oh, no, now this patent is essential, even though we never declared it before and even though we told the standards body that we would license any essential patents we had. Now, the other thing I'd like to mention, Your Honor, is that the only testimony in the record concerning the interplay between the settlement agreement and the 144 patent comes from true position's general counsel. And he was asked, why didn't the license provision include the 144 patent? And what he said was, we didn't include it because Andrew didn't need it. They didn't have a control channel product, and that's the reason we didn't include it. That's at appendix page 9837. But you need it now. And isn't this what concerned Judge Robinson, that there was no communication request for a license? Oh, well, that's a complete red herring, Your Honor. First of all, it concerns true position. That's an argument in their brief. Judge Robinson didn't mention the fact that we didn't request a license, and for a very good reason. The first time true position took the position with Andrew that you can't practice the standard without using our patent. And this was in a letter they sent when they found out about the STC contract, the Saudi telecom contract. They said, you can't possibly fulfill this So what they're suggesting is that we should have gone through the completely futile exercise of requesting a license they had already told us they weren't going to give us. And Judge Robinson didn't rely on that, and we submit it was for that very reason. If I could very quickly turn to the anticipation exclusion. Judge Robinson granted summary judgment rejecting our- That's a steep hill you have to climb. Well, Your Honor, perhaps it is. Use of discretion based on a reasonable, you'll tell me it's not reasonable, a reasonable premise. Let me say a couple of things about that. First of all, we think abusive discretion standards shouldn't apply because we think she was just wrong about what an expert has to do in terms of anticipation analysis. You don't have to define the meets and bounds of the claims. All you have to say is if it reaches that far, it covers the prior art, that's exactly what our expert's opinion was. But no expert opinion can just say this is my conclusion without providing the support for it. I think that the Supreme Court has made this clear in its Daubert and its Kumo cases, that for an admissible expert opinion, you need the expert's reasoning. That's absolutely right, Your Honor, and we submit that Dr. Goodman provided that both in his report and in his deposition. He went through limitation by limitation in his report, and he said which feature, first of all, he started from the premise that if you construe these claims broadly enough to reach geometrics, which incidentally is the way they ultimately were construed. He didn't know that at the time, but as it turns out, that's what Judge Robinson did. If you construe them broadly enough to reach geometrics, they're going to cover Kono, and here's why. He identified each feature in Kono that corresponded to the limitations. Then in his deposition, and we lay this out at pages 52 to 54 of the blue brief, he went through in detail each feature of geometrics that true position had identified as meeting a particular claim limitation, and he said, okay, if that meets that limitation, then so does Kono, and this particular feature of Kono, and here's why. A very good example of that, Your Honors, can be found at appendix pages 7382 to 89, which is where he goes through the reverse control channel limitation in his deposition and explains why, if it's in geometrics, you've got to find it in Kono, and he does that for each limitation. So we submit that he, in fact, did exactly what an expert's required to do and provided the basis for his opinion, and we think she made an error of law, but even if you disagree with that, under the Third Circuit law, which is what governs here, when exclusion of an expert means that an entire claim or defense is excluded, they apply a heightened abuse of discretion standard. They call it their hard look, a search and scrutiny standard, and under either test, we submit that it was error to exclude Goodman's testimony and, therefore, error to grant summary judgment on anticipation. If the Court has no further questions. We will save you some time for rebuttal. Let's hear from the other side. Thank you, Your Honor. Bill Seddick, is that how to pronounce your name? Yes, Bill Seddick. Your Honor, may it please the there were a lot of statements that characterized the record that we would disagree with in this case. True Position had the right to enforce this patent. It did so honestly and straightforwardly, and what you really just heard is a lot of attempts to excuse what amounts to a textbook case of willful infringement. We obtained the patent in 1994. In December of 2000, we told Andrew exactly what it covered, TDOA on the control channel. TDOA is a way of finding a cell phone. Control channel is one of the ways that a cell phone can transmit either when you're not talking, which is a control channel, or when you're talking, which is a voice channel, which carries your voice information. Andrew ignored that letter in December of 2000. We sued them for patent infringement on a series of other patents because Andrew was doing TDOA on the voice channel at that time, and Andrew actually relied on the 144 patent, which is the patent in suit, as a prior reference in the prior suit, in the prior litigation. So its lawyers clearly poured over the 144 patent and knew its scope. At the end of that case, and this is something that I think I want to get into, at the end of that case, there was a settlement agreement, which was more than just a settlement agreement. It was an agreement that covered a global agreement between the parties as to intellectual property disputes between them, and we licensed all of our patents to Andrew under that settlement agreement, all of them, except for the 144 patent and one other. And under that settlement agreement in February of 2004, Andrew negotiated a covenant not to sue under the 144 patent. Okay, that was the bilateral agreement. Let's set that aside and let's talk a little bit about their position that having enlisted their aid in getting this standard set, that the standard was not restricted so that it excluded the control channel. Well, both sides certainly submitted the standard to the standards body, but the point is that the reason that both parties did that is that they both wanted this UTDOA technology in the standard because both Truth Position and Andrew had a UTDOA product, one that did voice channel location, You didn't surface the 144 patent in the standard setting when you now claim it was necessary. Well, we didn't bring this suit based on the standard. We brought this suit based on the infringement of geometrics, and if you look at the complaint, we didn't reference geometrics, and we don't claim anything. But why aren't you stopped? Because in the settlement agreement that the court relied upon, there's a covenant not to sue that Andrew negotiated under the 144 patent that said that for purposes of E911, we're not going to sue Andrew. Andrew would not have negotiated that covenant not to sue if it believed that we weren't going to assert the patent for any purposes. And in the settlement agreement, Andrew also negotiated a covenant not to sue. And this disagreement excuses you from surfacing that before the SSO? Well, certainly it prevents Andrew from asserting equitable estoppel since the issue is whether or not Andrew reasonably inferred that we wouldn't assert the patent against Andrew. I do think that we acted correctly in the SSO. I don't think that's the issue here on the appeal insofar as there were a lot of options in the standard. And the TDOA that both parties put into the standard was covering both the voice channel and control channel, which means that our patent didn't cover completely the UTOA part of it. And the standard, what it said in the court's Rambis decision, which was effective at that time, essentially said that a patent had to be essential to a standard in order for you to have to declare that patent to the standards body. Tell us about willfulness. I'm sorry, go ahead. No, no. Why don't you answer Judge Lori's question? Willfulness? Willfulness. I don't think that the offer for sale really has anything to do with willfulness in this case. The jury expressly found that, expressly found a pre-suit act of infringement, the Ashburn demonstration, which was an infringement of Claim 31. They expressly found that in the verdict form. So the issue on willfulness is at the time of that pre-suit act of infringement, and this is in the jury instruction, which Andrew didn't object to, at the time of that pre-suit act of infringement, was Andrew objectively reckless? And what was their state of mind at that time? So irrespective of whether the offer for sale is an infringement or not, that's an infringement theory. That's not a willfulness theory. So under the Hurley decision that they cited- What is the substantial evidence to show willfulness beyond the fact of infringement? Well, I don't think that they've taken issue with that on appeal. In other words, they've agreed that they were objectively reckless and that they had the right subjective state of mind at the time of that pre-suit act of infringement. What they're saying is, there's not enough pre-suit acts. There's an offer for sale, which they claim was not an infringement, and then there was this demonstration, which they concede was. What I'm saying is it doesn't matter how many pre-suit acts of infringement you have. So long as you have some, then the question becomes whether or not the state of mind of the person at that time and the objective recklessness at that time is such as to support a willfulness. What was the evidence you presented to the jury to show objective recklessness beyond the fact of infringement? The issue, which I don't think they're raising here on appeal, was that- Well, the challenging willfulness. Okay. We certainly presented evidence that Andrew knew about the patent, that there was no evidence that there was a close case. There was the evidence of objective recklessness. It thought that you had violated the rules of the SSO, which might have precluded you from asserting a patent against them, right? I'm not sure what that has to do with willfulness. Well, you're saying the fact that they knew of the patent meant that they were necessarily willful. Right. And if they couldn't assert it because of failure to play by the SSO rules, then they had a reason for not expecting to be sued. And therefore, it wasn't willful. Well, certainly they knew about the patent and they knew about the standard, because they offered the same submissions to the standards body. So if the patent covers a standard, which again, we didn't make that as part of our case, if that's the case, then Andrew certainly knew about it at the time, knew that the patent covered the standard. In addition, in terms of the feasibility study promise that Andrew relies upon, it clearly shows that Andrew knew that it could only use anything within the standard if it took a license, and it never took a license here. So the rational conclusion from that would be that if they didn't have a license, it follows that we would enforce the patent against Andrew. And again, the real issue on appeal here is whether or not Andrew, the one that they're raising is whether or not Andrew reasonably inferred that we would not assert the patent against it. And it can't really do that in view of the settlement agreement, which specifically stated that there was a covenant not to sue Andrew for UTDOA, for its existing geometric system, for UTDOA. That was only for the control channel, not the voice channel, right. But not the control channel in GSM. So Andrew negotiated in the settlement agreement a covenant not to sue on UTDOA for the voice channel under certain circumstances. The voice channel, right. In GSM, which certainly leads to the reasonable inference that Andrew could not have inferred at that time that we were not going to assert the patent. That's irrelevant to the estoppel aspect. Once they joined with you in the establishment of the standard, and without putting any restraints and restrictions as to how that standard could be met. Yes, but Andrew, a true position, had been working prior to the settlement agreement for years on the standard. Setting aside the settlement agreement. Right. We have the question of equitable estoppel. Separate and distinct from the settlement agreement, the IPRs was not disclosed for the standard setting operation, right. The SSOs did not include the 144 patent. It was never disclosed at that point. That's correct. I'm still bothered by the fact that the summary judgment that was granted under California law, the unfair competition claim, was not properly submitted on the basis of all of the evidence that might have been available at that point in time to disclose the fact that the IPR was not included in the standard setting operation and the impact that it would have under that particular statute. There was a weighing of evidence which should not be done in the summary judgment provision. Well, but there was no nexus to California on summary judgment. In other words, what is the nexus to California? Well, the nexus under California law, if there's an impact, just like any other antitrust restrictions. There is no impact. There's an impact on the state of California within that particular jurisdiction. It does apply. I don't understand what the impact would be. There was a meeting. There was one of many meetings in California. And there's no evidence in the record of what even happened at those meetings, other than there were submissions at those meetings. But there was no submission of the 144 patent as part of the standard setting provisions. Well, that's true. But that would have typically, even under the evidence that they present, that would have been made in a fax declaration to ETSI in France. We could have done that. If we had a declaration, we had to do that. We could have done it from Pennsylvania while that meeting was happening and faxed it to ETSI in France. Even the evidence that they present shows that, at most, what you could do is provide this evidence to or provide this patent to the director at the meeting, not to the participants at the meeting. And that director would then send the information to France. So I don't see how you tie the omission to California. Is that a proper summary judgment? Or should there be sufficient evidence to go to trial if, in fact, there's a weighing of evidence by the judge at that point, one versus the other? I don't think that she did weigh the evidence. I think there was no evidence at all of any nexus to California at all, none. I think it's important that what they're raising here, I want to mention, is equitable estoppel. And equitable estoppel requires that you show that you reasonably inferred that somebody wouldn't assert the patent against you. The settlement agreement states that Andrew negotiated a covenant not to sue of UTDOA in GSM. These are the GSM standards that they're talking about. But that was a different system. It was the same system except, exactly the same system, except that it was doing the voice channel versus the control channel. Exactly. Otherwise, it was exactly the same system. And what we submitted to the standards body covered both the voice channel and the control channel in GSM. So it was the same subject matter. It was the GSM subject matter. It was the control channel and voice channel in GSM. And if Andrew reasonably negotiated a covenant not to sue patent that covers some aspects of CDOA, it follows that it could not have reasonably inferred at that point that we wouldn't assert the patent against TDOA and GSM ever. But once the standard was adopted through the efforts of you both, their argument is that this was a different situation. And it is a different situation, isn't it, once the standard is adopted? Well, once the standard was adopted, Andrew infringed the patent twice, according to what both the jury and the court found. And Andrew never asked for a license, never suggested that. I mean, all the evidence that they're relying upon says that for their equitable estoppel claim, it says that we relied on the notion that true position was going to offer us a license and it would be available. Well, why didn't they approach us for a license? Why didn't they tell us about it when they infringed, both with respect to the offer for sale in December of 2004 and with respect to the Ashburn demonstration in August of 2005? We didn't hear anything about standards at all. They ever asked for a license? They did not, no. And they continued infringing after we filed the complaint. And they continued infringing after the jury rejected their standards-based offenses. And there's a lot of statements in the record that we disagree with that he made. One of them is that there was a contractual obligation that required Andrew to continue infringing after we filed the suit. That's just not the case. I mean, Andrew repeatedly took the position in this case that there were different phases of this contract so that they could reduce the damages award. So the position they took throughout this case was that they were not contractually obligated, that each phase of this work with STC was a separate phase and not something they were contractually obligated to do. So they continued infringing after we filed the suit. They continued infringing after we won trial and rejected their standards-based offenses. Is there anything else you need to tell us? I think that with respect to both the equitable stop-buying California business code claims, I think it's important to realize that the evidence that Andrew is relying upon itself shows that Andrew could not have reasonably believed that we wouldn't enforce this patent against Andrew. The fact that it discusses a license and that Andrew didn't ask us for a license and just infringed anyway. It knew it didn't have a license. The fact that we sent them a letter and that they knew about the patent, knew about the standard, and to the extent that the standard is covered by the patent, Andrew must have  Mr. Melsedek talked a lot about the fact that Andrew knew about the patent. Of course we knew about the patent. Our awareness of the patent isn't at issue. What's at issue is the relationship between the patent and the proposed standard. There was no declaration that this patent is essential to the standard, knowing that in general terms, UTDOA on the control channel tells you nothing about whether it covers the specific standard that's being proposed. That's the whole function of the obligation under the rules to declare these patents. The standard doesn't provide an automatic right to practice under any of the patents that might be related. That's correct, Your Honor. It does not. And that leads into my second point. Mr. Melsedek again emphasized, as he does in his brief, the fact that Andrew didn't ask for a license. First of all, until the patent is declared as essential, there's no reason to ask for a license. First of all, until the standard is adopted and the patent has been declared, you don't need a license. Unless you just happen to be practicing what's covered by the patent, which has nothing to do with the standard. Exactly. But when the standard is adopted and you're practicing the standard and the patent has not been declared, you have no reason to ask for a license. And second, as I mentioned in my opening remarks, the first time true position told Andrew, hey, you can't practice this standard without using our patent, they also said, and we're not giving you a license. So to suggest that we should have asked for a license after that makes no sense. Mr. Melsedek also talked about the covenant not to sue and the reference to there was a covenant not to sue for E911 use. Again, the standard had not been adopted yet. There was no, and true position's general counsel, when asked about the covenant not to sue, gave testimony much like the testimony I referenced before about the license. And I'm looking at 9839 of the appendix around lines 22 to 24. He was asked about the covenant not to sue and he said, we felt the voice control product they were licensing at that time didn't cross our 144 patent, so we agreed to do that. Again, the covenant not to sue covered what was at issue at the time. We knew we had E911 obligations, so Andrew got the covenant not to sue needed for that, but the standard was still almost a year away. There was no obligation on true position's part at that point to give us a license to a standard that had not yet been adopted and its precise contours couldn't even be known at that point. On the, Mr. Melsedek asserted that the true position acted properly in the standard setting organization and that we were not challenging that. Well, quite to the contrary, Judge Robinson found that true position violated the disclosure rule. That was improper and its explanation about, well, it was an option under a standard and so we didn't think it was covered. Judge Robinson didn't buy that and interestingly, none of the internal correspondence at true position concerning the standard and should we declare and all that, none of it makes any reference to this option under a standard notion. That was a litigation contrivance. As far as the California nexus, there were three standards meetings in California. I referenced the rules that govern those meetings earlier. At each of those meetings, standards proposals were made. Now, Mr. Melsedek admitted that when a standards proposal is made, a declaration of any essential IPR has to be made somewhere. Their position is you couldn't do it at the meeting. You had to do it at Etsy in France. Even if that's true, they made these proposals at the California meetings, never declared the patent anywhere, either at those meetings or to Etsy in France. That's sufficient misleading conduct in California to justify application of the statute, certainly at the summary judgment stage. And the last point I wanted to make is on the Ashburn demonstration. The Ashburn demonstration can't fill the gap in the willful infringement evidence. Neither true position nor the district court relied on Ashburn at all below to justify the enhanced damages judgment. And for good reason. This was a one-time private demonstration for the US government, resulted in no lost sales and no harm to true position, was barely mentioned at trial. So to suggest that the willfulness judgment could rest on that alone just doesn't hold any water. And even if it could rest on Ashburn under Third Circuit law, where a general verdict results from when two theories are submitted to a jury as a basis for a general verdict, and one of them is legally improper, as we say the offer to sell theory was here, at a minimum, you get a new trial. That's the Hurley case out of the Third Circuit. And we think that willfulness judgment should be vacated entirely. But at a minimum, a new trial is required, if the court has no further questions. Okay. Thank you, Mr. Trelawney. Mr. Mills said it. The case is taken under submission. That concludes the argued cases for today.